DECISION AND JUDGMENT ENTRY
{¶ 1} This is an appeal from a judgment of the Sandusky County Court of Common Pleas, in which the trial court confirmed an arbitration award in a case involving a contract dispute. On appeal appellants, Kent T. Weickert, Michael J. Weickert, Thomas J. Weickert, and Weickert Agencies, Inc. ("Weickerts"), set forth the following as their sole assignment of error:
 {¶ 2} "The trial court erred in confirming the arbitration award herein."
 {¶ 3} This is the third time the parties have been before this court in an attempt to resolve a dispute involving the sale of an insurance business by appellees, Lee and Sharon Bowden ("Bowdens"), to their nephews, the Weickerts. The undisputed facts that are relevant to the issues presented in this appeal are as follows. In a purchase agreement executed in June 1998, the Weickerts agreed to buy an insurance business from the Bowdens ("Bowden Agency"). At the time the agreement was executed Lee Bowden, owner/operator of the Bowden Agency, was a long-time, licensed broker for Cincinnati Insurance Company ("Cincinnati").
 {¶ 4} In addition to setting out a formula for establishing the sale price, the purchase agreement contained provisions governing the transfer of current insurance policies, commissions, accounts receivables and customers, i.e., "goodwill," to the Weickerts. The agreement also stated the Weickerts would employ Lee Bowden as an insurance agent for up to ten years after the sale, and provided for payment of commissions earned by Bowden during the course of such employment. In addition, the Weickerts agreed to pay up to $30,000 for Lee and Sharon Bowden's health insurance premiums and social club dues over a ten year period.
 {¶ 5} The agreement contained a non-competition clause which stated, in relevant part:
 {¶ 6} "COVENANT NOT TO COMPETE With the exception of activities related to the sale, service and management of bail bonds, Seller (the Bowdens) agrees not to compete with Buyer (the Weickerts) either directly or indirectly, or as an agent, employee, owner or principle shareholder, owner, unit holder or director of a corporation, limited liability company, partnership or other entity, legal or otherwise, or as a manager of any insurance business with a thirty (30) mile radius of the Business a (sic) 426 Croghan Street, Fremont, Ohio 43420, for the next ten (10) years. * * *."
 {¶ 7} The purchase price was to be allocated as follows:
 {¶ 8} "i) Customer List (20%);
 {¶ 9} "ii) Insurance Policies (20%);
 {¶ 10} "iii) Expirations [of policies] and Expiration Records (20%);
 {¶ 11} "iv) Goodwill and Receivables (20%);
 {¶ 12} "v) Covenant Not to Compete (20%)."
 {¶ 13} Paragraph 13 of the purchase agreement provided for monetary penalties if the Weickerts substantially breached the purchase agreement. Those remedies included forfeiture of the $10,000 down payment and reversion of the business to the Bowdens if a breach occurred during the first two years, and a forced sale of the business if a breach occurred after the first two years. Pursuant to paragraph 14 of the purchase agreement, in the event the Bowdens substantially breached the purchase agreement, the Weickerts were entitled to "employ any and all remedies available in law or equity."
 {¶ 14} Paragraph 16 of the purchase agreement stated:
 {¶ 15} "If any dispute shall occur between the parties pertaining to this Agreement or the interpretation of any provision herein, the parties agree to submit their dispute first to binding arbitration in accord with the rules of the American Arbitration Association before the [sic] resort to any court of law."
 {¶ 16} Shortly after the purchase agreement was executed, disagreements arose between the parties as to how the business should be run. In June 1999, the Bowdens filed a complaint in the Sandusky County Court of Common Pleas in which they alleged the Weickerts breached the terms of the purchase agreement. Pursuant to paragraph 16, the trial court referred the case to arbitration, and an arbitrator was chosen. However, instead of conducting an arbitration proceeding, the arbitrator attempted to mediate the parties' dispute. The result was a handwritten document, in which the parties agreed on a reduced purchase price of $185,000, with the Weickerts making a lump-sum payment of $160,000. The remaining balance of $25,000 was to be paid in yearly installments of $5,000. In addition, the non-compete provision was altered so that Lee Bowden agreed: 1) not to compete with the Weickerts' insurance business within a 30 mile radius for a period of 5 years; 2) not to "be licensed with Cincinnati Insurance Co."; and 3) not to "join as agent or solicit another insurance agency that competes with Weickerts or solicits Weickerts' clients." However, further details of the attempted settlement, which were to be "fleshed out" by the parties at a later date, were never finalized. As a result, the Bowdens filed a motion in the trial court to return the case to arbitration, which the trial court granted. That decision was upheld by this court on appeal. See Bowden v. Weickert (May 18, 2001), 6th Dist. No. S-00-039 ("Bowden I").
 {¶ 17} On October 8, 2001, arbitration proceedings were conducted by the same individual who attempted to mediate the parties' disputes ("first arbitration"). On December 3, 2001, the arbitrator issued a decision. The arbitrator's award was confirmed by the trial court on June 20, 2001, and a timely appeal was filed by the Weickerts on July 17, 2001, in which they asserted the trial court erred by confirming the first arbitration award.
 {¶ 18} On June 20, 2003, this court issued an opinion in which we found that the trial court erred by affirming the first arbitration award, because the same individual functioned as mediator and arbitrator. Bowden v. Weickert, 6th Dist. No. S-02-017, 2005-Ohio-3223 ("Bowden II"). The case was remanded for the purpose of conducting a second arbitration proceeding with a new arbitrator, whom we specifically instructed to "take into account that the Weickerts paid $160,000 to the Bowdens, and that the Weickerts have been running the insurance business without objection from the Bowdens." Id.
 {¶ 19} A second arbitration hearing was conducted on April 22 and 23, 2004, before a newly appointed arbitrator. The issues articulated by the parties' attorneys at the outset of the hearing were: 1) whether the Weickerts breached the purchase agreement by canceling Lee Bowden's license with Cincinnati and not continuing to pay the Bowdens' health insurance premiums and club dues after January 1999; 2) whether the Weickerts violated the purchase agreement by not signing a lease; 3) what part of the purchase price, if any, remained unpaid; 4) whether Lee Bowden violated the terms of the employment agreement between himself and the Weickerts; and 5) whether Lee Bowden violated the terms of the 10-year, 30 mile non-compete agreement.
 {¶ 20} Testimony was presented at the arbitration hearing by Lee and Sharon Bowden, Bowden Agency employee Angela Woodel, Certified Public Accountant Grover Rutter, and Michael and Kent Weickert. The Bowdens, the Weickerts, and Woodel all testified generally as to the deterioration of the business relationship between the Bowdens and the Weickerts after the purchase agreement was signed. In addition, Lee Bowden testified that, after the business was sold, his ability to write property and casualty insurance policies was severely restricted by Michael Weickert. Specifically, Bowden testified his computer hard drive, which contained all his files, was "wiped clean" and the client files were locked while he was vacationing in Florida. Bowden further testified he was required to photograph all the properties he insured, at his own expense.
 {¶ 21} As to the sale of the business, Lee Bowden testified that after deducting $30,000 for health insurance premiums, the original purchase price, as calculated pursuant to the purchase agreement, was $302,166.58. He further testified that, after making a $10,000 down payment and prepaying $11,262.79 in interest, the Weickerts agreed to pay the remaining balance due in 120 installments of $2,346.41 each.
 {¶ 22} Bowden stated, by the time second arbitration hearing was held, the Weickerts had paid the down payment, prepaid interest, and 14 of the original $2,346.41 monthly payments. Bowden also testified that, pursuant to the failed settlement attempt, the Weickerts made a $160,000 lump sum payment and three annual payments of $5,000 each in December 2000, December 2001, and December 2002, respectively. Bowden further stated that the Weickerts cancelled his health insurance, effective January 1999, forcing him to obtain temporary coverage and, eventually, to affiliate with another insurance agency so he and his wife could obtain group coverage. As to the non-competition clause, Bowden stated he began selling life and health insurance after the attempted settlement failed.
 {¶ 23} Sharon Bowden testified that Michael Weickert did not want clients to know the business was sold. As a result, friction developed between Lee Bowden and the Weickerts, because clients continued to think Lee Bowden ran the business.
 {¶ 24} Michael Weickert testified that the agency's gross receipts declined every year after the business changed hands. Weickert further stated that he and Lee Bowden had different views on what constituted "new business," resulting in disagreements over the amount of commissions owed to Bowden. He testified that the Weickerts never signed a lease to rent Bowden's office, as required by the purchase agreement, because a satisfactory lease was not forthcoming.
 {¶ 25} Both Michael and Kent Weickert testified they made the $160,000 lump sum payment because they expected to get a better non-competition agreement than the one in the original purchase agreement, and to end the dispute between the parties. Specifically, the Weickerts stated they hoped to bar Lee Bowden from ever selling insurance for Cincinnati, in contrast to the original contract, which allowed Bowden to re-associate with Cincinnati after ten years.
 {¶ 26} Angela Woodel testified she worked for the Bowden Agency from 1985 until it was sold in 1998, after which she continued to work for the Weickerts until 2001. Woodel stated that, after the sale, Lee Bowden and Michael Weickert had constant disagreements as to how the business should be run. She further stated that it was her impression the Bowdens were not to tell clients the business had been sold.
 {¶ 27} Rutter, an expert witness presented by the Weickerts, testified that the 106 equal monthly payments of $2,346.41 would total $248,719. In contrast, the $160,000 lump sum payment, compounded at an interest rate of 6.2%[1] over 106 months, would amount to a "future value" of $272,144. Rutter further testified that, depending on the amount of adjustments for prepaid interest, club dues and health insurance, the Bowdens were overpaid by an amount ranging anywhere from $1,851 to $60,334. On cross-examination, Rutter admitted the "future value" of the $160,000 payment could go up or down, depending on the interest rate.
 {¶ 28} On May 26, 2004, the arbitrator issued a decision, after examining the terms of the purchase agreement and the parties' various exhibits, and reviewing testimony given at the arbitration hearing. At the outset, the arbitrator stated that, in making his decision, "little weight" was given to evidence of the parties' agreements made subsequent to the execution of the purchase agreement. However, the arbitrator cited our mandate inBowden II, supra, to "take into account that the Weickerts paid $160,000.00 to the Bowdens and that the Weickerts had been running the insurance business without objection from the Bowdens."
 {¶ 29} In his decision, the arbitrator found the parties were unable to reach a mutual agreement as to the lease terms; therefore, the Weickerts did not breach their agreement to lease office space from the Bowdens. The arbitrator also found Lee Bowden did not breach his agreement to help the Weickerts generate new business after July 1, 1998, since the parties agreed not to tell clients the business had been sold. The arbitrator stated the contract was not breached when the Bowdens' health insurance was cancelled, since they were not eligible for coverage under the Weickerts' new policy.
 {¶ 30} The arbitrator found that Lee Bowden breached the purchase agreement when he threatened a lawsuit against the Weickerts in the presence of a Cincinnati representative. However, no breach of the non-competition clause occurred because "the competition [by Lee Bowden], if any, was insignificant." Ultimately, the arbitrator concluded that any "breaches of the contract by the parties * * * are far outweighed by substantial performance by [Bowdens] and [Weickerts] of their respective primary obligations. * * *" Thereafter, he stated:
 {¶ 31} "the primary obligation of the [Weickerts] was to purchase the business and its assets which, for the most part, has been performed. However, the conduct of the parties made it impossible for them to accomplish their respective future obligations for the 9-year period after suit was commenced. * * * Therefore, the Arbitrator finds a mutual assent by the parties to a recision [sic] of the manner to perform the future obligations. * * *"
 {¶ 32} As examples of the parties' "conduct," the arbitrator cited the "unreconcilable [sic] conflict between Lee Bowden and Michael Weickert," and Lee Bowden's inability to work 500 hours per year for the Weickerts. The arbitrator also found the parties, by their respective actions, waived enforcement of the contract remedies set forth in sections 13 and 14 of the purchase agreement.
 {¶ 33} After making the above findings, the arbitrator further concluded the Bowdens were not "fully compensated [for the business] and are entitled to additional compensation from [the Weickerts]." Specifically, the arbitrator found the original purchase price for the business was $321,569.74; however, the parties actually "contemplated" a net sale price of $281,569.74, after giving the Weickerts credit for $30,000 in health insurance premiums, the $10,000 down payment, and $11,262.79 in prepaid interest. The arbitrator then found that events occurred "which were not contemplated by the parties" when the purchase agreement was executed, including the parties' "mutual breaches of the contract" and the Weickerts' change of health insurance carriers, which prevented the Weickerts from paying the full price of the Bowdens' health insurance premiums. Ultimately, the arbitrator awarded the Bowdens an additional $80,230.05, based on the following calculations:
{¶ 34} "Original purchase price: $321,569.74{¶ 35} "Letter of Intent -2,000.00{¶ 36} "Execution of contract -8,000.00{¶ 37} "Prepaid interest -11,262.79{¶ 38} "14 monthly payments of $2,346.41 -32,849.74{¶ 39} "Health Insurance [actually paid] -7,721.99{¶ 40} "12/18/99 payment by defendants -160,000.00{¶ 41} "12/00 payment by defendants -5,000.00{¶ 42} "12/01 payment by defendants -5,000.00{¶ 43} "12/02 payment by defendants -5,000.00 _________{¶ 44} " $84,735.22{¶ 45} " -4,505.17[2]
_________{¶ 46} "NET AMOUNT $80,230.05
 {¶ 47} On August 9, 2004, the Weickerts filed a motion in which they asked the trial court to "vacate, modify, or correct arbitrator's award," which the Bowdens opposed. On October 25, 2005, the Bowdens filed an application asking the trial court to affirm the arbitrator's award. On December 14, 2004, a hearing was held, at which attorneys for both parties presented arguments.
 {¶ 48} On February 14, 2005, after reviewing the transcript of the arbitration hearing and the exhibits which were before the arbitrator, the trial court affirmed the arbitrator's decision and entered judgment for the Bowdens in the amount of $80,230.05, plus interest. The Weickerts filed a timely notice of appeal on March 14, 2005.
 {¶ 49} On appeal, the Weickerts assert that the trial court erred by upholding the arbitrator's decision. In support, the Weickerts argue the arbitrator exceeded his authority by "ignor[ing] the terms of the original purchase agreement" and fashioning a result which bears no "rational nexus" to the terms of the purchase agreement. Specifically, the Weickerts claim the arbitrator wrongfully: 1) "ignored" the terms of the purchase agreement by finding the parties waived the contractual remedies set forth in paragraphs 13 and 14; 2) refused to adopt Rutter's opinion that, by paying the $160,000 lump sum, the Weickerts actually overpaid the Bowdens for the business; and 3) found the Weickerts owed the Bowdens an additional $80,230.05, "without determining or ordering that the Bowdens provide equitable and justifiable consideration by way of the 10 year non-compete * * *."
 {¶ 50} We begin by noting that, generally, arbitration awards are presumed valid, and a reviewing court may not merely substitute its judgment for that of the arbitrator. Findlay CitySchool Dist. Bd. of Edn. v. Findlay Edn. Assn. (1990),49 Ohio St.3d 129, 132, reversed on other grounds, Cincinnati v. OhioCouncil 8, AFSCME, 61 Ohio St.3d 658. R.C. 2711.10 sets forth narrow grounds upon which a court of common pleas may review an arbitration award. In this case, the relevant statutory provision is R.C. 2711.10(D), which states that the court of common pleas shall vacate an award upon the application of any party to the arbitration if: "[t]he arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final and definite award upon the subject matter submitted was not made." Id.; GoodyearTire Rubber Co. v. Local Union No. 200 (1975),42 Ohio St.2d 516, 520, certiorari denied (1975), 423 U.S. 986, 96 S.Ct. 393,46 L.Ed.2d 303.
 {¶ 51} The standard of review to be employed on appeal is whether the lower court erred as a matter of law in confirming the arbitration award. Bd. of Trustees v. Frat. Order of Police
(2001), 146 Ohio App.3d 456, 459, citing McFaul v. UAW Region 2
(1998), 130 Ohio App.3d 111, 115. Accordingly, our review in this case is narrowly confined "to an evaluation of the confirmation order of the common pleas court and we cannot review the substantive merits of the award absent evidence of material mistakes or extensive impropriety." Brumm v. McDonald Co.Securities, Inc. (1992), 78 Ohio App.3d 96, 104, citing Oil,Chemical Atomic Workers Internatl. Union, AFL-CIO, Local 7-629v. RMI Co. (1987), 41 Ohio App.3d 16, 20.
 {¶ 52} It is well established that an arbitrator will not be found to have exceeded his or her authority, so long as the award "draws its essence" from the underlying contract. Findlay,
supra, at 132; Goodyear v. Local Union No. 200, supra. "`An arbitrator's award draws its essence from a[n] * * * agreement when there is a rational nexus between the agreement and award, and where the award is not arbitrary, capricious or unlawful.'" Id., quoting Mahoning Cty. Bd. of Mental Retardation v. MahoningCty. TMR Edn. Assn. (1986), 22 Ohio St.3d 80, at 83-84.
 {¶ 53} "The overriding policy reason for this limited form of review is founded upon the principle that when parties voluntarily agree to submit their dispute to binding arbitration, they agree to accept the result regardless of its legal or factual accuracy." Ford Hull-Mar Nursing Home, Inc. v. Marr,Knapp, Crawford Assoc., Inc. (2000), 138 Ohio App.3d 174, 179, citing Goodyear Tire and Rubber Co., supra. Such a policy is necessary because, "[i]f the parties could challenge an arbitration decision on the ground that the arbitrators erroneously decided legal or factual issues, no arbitration would be binding. * * *" Huffman v. Valletto (1984),15 Ohio App.3d 61, 63.
 {¶ 54} In this case, as set forth above, the arbitrator addressed each of the issues raised by the parties at the arbitration hearing. As to the issue of breach of contract, the arbitrator determined, after hearing testimony and/or reviewing exhibits presented by both parties, that their actions amounted to a mutual "rescission" or, more accurately, an abandonment, of the breach of contract remedies and future performance obligations set forth in the original purchase agreement.
 {¶ 55} As to the issue of monetary damages, after reviewing the purchase contract, exhibits showing the amounts paid by the Weickerts, hearing Rutter's testimony, and considering our mandate to take into account the Weickerts' $160,000 lump sum payment, the arbitrator determined the Weickerts still owed the Bowdens $80,230.05. Contrary to appellant's assertion, the arbitrator was free to accept or reject Rutter's testimony concerning the "future value" of the $160,000 lump sum payment. See Plastech Engineered Products, Inc. v. Cooper-StandardAutomotive, Inc., 3rd Dist. No. 5-03-26, 2003-Ohio-6984, at ¶ 12
(A claim that evidence was not considered by the arbitrator "essentially challenges the weight of the evidence and [an appellate court is] prohibited * * * from independently weighing the evidence presented to the arbitrator.").
 {¶ 56} After reviewing the entire record before the trial court and the arbitrator, we cannot say the arbitrator's resolution of the above issues had no "rational nexus" to the purchase agreement, or that they were "arbitrary, capricious, or unlawful." However, we note that both parties have indirectly raised the question of what effect, if any, the arbitrator's decision had on the 10-year, 30-mile non-compete agreement. That issue now requires our attention.
 {¶ 57} In their appellate briefs, both the Weickerts and the Bowdens interpreted the arbitrator's decision to mean that all "future obligations" under the purchase agreement, including the last few years of the 10-year, 30-mile non-compete agreement, were ended. Upon close inspection of the arbitrator's decision, we disagree, for the following reasons.
 {¶ 58} First, the arbitrator found the Bowdens' and Weickerts' conduct demonstrated their clear intent to buy, and sell, the business and its assets. It is undisputed that the non-compete clause was one of the assets the Weickerts originally intended to purchase from the Bowdens. For example, in the purchase agreement, the parties allocated 20% of the purchase price to the 10-year, 30-mile "covenant not to compete," and another 40% to other assets, namely, "good will" (20%) and the Bowdens' "customer list" (20%), which are directly affected by the non-compete. Second, the arbitrator did not specifically state that the non-compete agreement was "rescinded." Examples cited by the arbitrator in support of "rescission" of the parties' future contract obligations included "mutual breaches of the contract" and the Weickerts' failure to pay the full price of the Bowdens' health insurance premiums and club dues. In contrast, the arbitrator specifically found Lee Bowden had not substantially breached the non-compete agreement as of May 26, 2004. Accordingly, the original 10-year, 30-mile non-compete provision in the purchase agreement was not terminated or abbreviated by the arbitrator's decision, and it remains in effect.
 {¶ 59} This court has reviewed the entire record that was before the trial court, including the testimony and exhibits presented at the arbitration hearing. On consideration thereof, we find there is a "rational nexus" between the arbitrator's award and the purchase agreement executed by the parties, and the arbitrator's decision contains no "material mistakes" or "extensive impropriety." Accordingly, we cannot say the trial court erred as a matter of law by affirming the arbitrator's decision pursuant to R.C. 2711.10. The Weickerts' sole assignment of error is not well-taken.
 {¶ 60} In Bowden II, we expressed concern over the fact that, in this case, "multiple proceedings" have been commenced in the trial court, and this court, in addition to a mediation and two arbitration proceedings. At this point, no issues "arising out of" the original purchase agreement remain to be resolved. Accordingly, today's decision puts an end to the arbitration proceedings required by the original purchase agreement.
 {¶ 61} The judgment of the Sandusky County Court of Common Pleas is affirmed. Appellants are ordered to pay the costs of this appeal pursuant to App.R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Sandusky County.
JUDGMENT AFFIRMED.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
Handwork, J. Skow, J. Parish, J. concur.
[1] Rutter stated he chose the 6.2% interest rate based on suggested rates in a December 1999 publication issued by the Internal Revenue Service.
[2] The arbitrator credited Weickerts in the amount of $4,505.17 after finding the payment of $11,262.79, designated as "prepayment of interest" resulted in an overpayment.